UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NEW YORK STATE ELECTRIC & GAS CORPORATION,


                                    Plaintiff,

                                                        DECISION AND ORDER

                                                        09-CV-6618L


                        v.

U.S. GAS & ELECTRIC, INC. et al.,



                                    Defendants.
_____


        This is a trademark action.  The principal issue is whether U.S. Gas & Electric's recent

use of the acronym  "NYG&E" and "New York Gas & Electric" in connection with its supply of

natural gas and electricity in New York State infringes on the "NYSEG" mark, long-used by

plaintiff, New York State Electric & Gas Corporation.  While the ultimate determination of that

question cannot be made at this time and must await further proceedings, I find that plaintiff has

demonstrated enough of a likelihood of success on that issue to warrant preliminary injunctive

relief, and I therefore enjoin defendant from its use of the offending marks, pending further order

of this Court.

        Plaintiff, New York State Electric & Gas Corporation ("NYSEG"), brings this action

under §§ 43(a) and 32(1) of the Lanham Act (15 U.S.C. §§ 1125(a) and 1114(1), respectively),

and N.Y. Gen. Bus. L. §§ 349 and 360-*l*, against U.S. Gas & Electric, Inc. ("USG&E"), seeking

legal and equitable relief based on USG&E's use of the name "New York Gas & Electric" and the abbreviation "NYG&E" in connection with the sale or supply of natural gas and electricity within New York State.

Several motions have been filed by the parties in this action. NYSEG has filed a motion for a preliminary injunction, seeking to enjoin USG&E from continuing to use the "New York Gas & Electric" and "NYG&E" marks. USG&E has moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and to strike plaintiff's motion for a preliminary injunction.

## BACKGROUND[1]

NYSEG, a New York corporation, is a regulated utility company that currently serves about 873,000 electricity customers and 259,000 natural gas customers in various areas of upstate New York. Plaintiff has used the trade name "New York State Electric & Gas" since 1929, and the "NYSEG" mark since 1980. Amended Complaint (Dkt. #10) ¶¶ 9, 10. Plaintiff is also the owner of two federally registered trademarks, one (No. 2,238,079) for the mark "NYSEG," and one (No. 3,656,846) for a stylized form of that same mark, which were registered in April 1999

---

[1]Both sides have submitted materials outside the pleadings in connection with NYSEG's motion for a preliminary injunction and USG&E's motion to strike. To the extent that I have considered those materials, I have done so only in connection with those two motions. I have not considered those materials in deciding the motion to dismiss for failure to state a claim under Rule 12(b)(6). See *Ecogen, LLC v. Town of Italy*, 438 F.Supp.2d 149, 163 n.7 (W.D.N.Y. 2006); *Township of West Orange v. Whitman*, 8 F.Supp.2d 408, 414 (D.N.J. 1998). Unless otherwise noted, then, the background facts are taken from the allegations of the amended complaint.

and July 2009 respectively.  Amended Complaint Ex. A (Dkt. #10-2).  Plaintiff's full trade name,

"New York State Electric & Gas," is not registered.

USG&E, a Delaware corporation with its principal place of business in Florida, is an

energy service company ("ESCO").  In New York, electricity and natural gas are physically

delivered through infrastructure (such as pipes and power lines) owned by regulated utility

companies like NYSEG.  Consumers, however, have the option of purchasing energy either

directly from the regulated utility company servicing their area, or from an independent ESCO.

Thus, if a consumer within NYSEG's regulated service area selects an ESCO as his energy

supplier, the energy will be delivered to the consumer through NYSEG's infrastructure, but his

account will be serviced by, and the consumer will directly deal with, the ESCO.  The

consumer's bill will typically reflect both the ESCO's supply charges and NYSEG's delivery

charges.

USG&E has been operating in NYSEG's regulated service area since around March

2007.  According to plaintiff, defendant initially operated in New York under the "U.S. Gas &

Electric" trade name.  In October 2009, however, USG&E informed NYSEG of its intent to

begin using the name "New York Gas & Electric" in New York.  Amended Complaint ¶ 21.[2]  On

October 23, 2009, NYSEG, through its counsel, sent USG&E a cease-and-desist letter objecting

to defendant's rebranding and planned use of that name.  *Id.* ¶ 22; Dkt. #8-2 at 2.

_____

[2]A copy of that letter has been submitted by USG&E as part of its papers in opposition to
plaintiff's motion for a preliminary injunction.  *See* Dkt. #13-2 at 2.  *See Rederford v. U.S.
Airways, Inc.*, 589 F.3d 30, 35 (1st Cir. 2009) (in considering a motion to dismiss, court "may
consider not only the complaint but also facts extractable from documentation annexed to or
incorporated by reference in the complaint and matters susceptible to judicial notice") (internal
quote omitted); *accord McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

USG&E did not respond to that letter.  NYSEG sent another cease-and-desist letter on October 30, 2009.  USG&E's counsel acknowledged receipt of that letter, but USG&E never substantively responded to that letter either.  Around December 1, 2009, USG&E began marketing its natural gas and electricity services to New York consumers under the name New York Gas & Electric.  USG&E also began using the NYG&E mark at around that time.

NYSEG filed the complaint in this action a few days later on December 4, 2009.  The amended complaint asserts four claims for relief.  The first is a claim under § 43(a) of the Lanham Act, which provides a private right of action against any person "who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... ."  15 U.S.C. § 1125(a).  NYSEG alleges that defendant's use of "New York Gas & Electric" and "NYG&E" in connection with the marketing of natural gas and electricity to consumers in New York is likely to cause such confusion as to whether there is some connection or shared identity between plaintiff and defendant.

The second cause of action asserts a claim under § 32(1) of the Lanham Act, which provides a right of action against any person who, without the consent of the registrant, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to

deceive ... ."  15 U.S.C. § 1114(1)(a).  This cause of action relates to plaintiff's "NYSEG" mark, which, as stated, is registered with the United States Patent and Trademark Office.

Plaintiff's third claim for relief sets forth a claim under N.Y. Gen. Bus. L. § 349, which makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state ... ."  The fourth claim is asserted under Gen. Bus. L. § 360-*l*, which provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

Plaintiff's demand for relief seeks a permanent injunction prohibiting USG&E from using "New York Gas & Electric" or "NYG&E" in connection with the marketing of natural gas or energy, and from engaging in any acts that are likely to lead consumers to believe that defendant is affiliated or associated with, or sponsored by, NYSEG.  Plaintiff also seeks compensatory damages, an order directing USG&E to disgorge all of its profits attributable to its allegedly unlawful activities, treble damages under § 35(a) of the Lanham Act (15 U.S.C. § 1117(a)), punitive damages, and attorney's fees.

# DISCUSSION

## I. General Principles

### A. Preliminary Injunctions

To obtain a preliminary injunction,

a party ... must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406 (2d Cir.) (quoting *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000)), *cert. denied*, 546 U.S. 1033 (2005).  Whether to grant or deny a preliminary injunction under these standards lies within the sound discretion of the district court.  *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 237 (2d Cir. 2001); *P&G v. Ultreo, Inc.*, 574 F. Supp. 2d 339 (S.D.N.Y. 2008).

### B. Motions to Dismiss under Rule 12(b)(6)

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir.  2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet that standard.  *Id.*

"When there are well-pleaded factual allegations a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*. at 1950. Elaborating on those principles, the Supreme Court has explained that

> [a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* at 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (internal citations omitted). In short, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–that the pleader is entitled to relief," which is not enough to survive a motion to dismiss. *Id.* at 1950.

### C. Lanham Act

Since both NYSEG's motion for a preliminary injunction and USG&E's motion to dismiss thus require the Court to consider the merits of plaintiff's claims, some familiarity with the standards applicable to Lanham Act claims is necessary before considering either motion.

As stated, NYSEG asserts claims under two sections of the Lanham Act, § 43(a) (15 U.S.C. § 1125(a)), and § 32(1) (15 U.S.C. § 1114(1)), which apply to unregistered and registered marks, respectively. The protections offered by these two sections, and the standards for applying them, are largely quite similar, however. *See Louis Vuitton Malletier v. Dooney &*

*Bourke, Inc.* ("*Dooney*"), 454 F.3d 108, 114 (2d Cir. 2006) ("the same analysis applies to claims

of trademark infringement under § 32" as to claims under § 43(a) of the Lanham Act); *Chambers*

*v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) ("Section 43(a) is a broad federal unfair

competition provision which protects unregistered trademarks similar to the way that section

32(1) of the Lanham Act, 15 U.S.C. § 1114(1), protects registered marks").

In *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400 (2d Cir. 2005), the Second

Circuit succinctly set forth the standards for relief under both sections:

> In order to prevail on a trademark infringement claim for registered trademarks, pursuant
> to 15 U.S.C. § 1114, or unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a
> plaintiff must establish that (1) it has a valid mark that is entitled to protection under the
> Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) "in
> connection with the sale ... or advertising of goods or services," 15 U.S.C. § 1114(1)(a),
> (5), without the plaintiff's consent.  In addition, the plaintiff must show that defendant's
> use of that mark "is likely to cause confusion ... as to the affiliation, connection, or
> association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of
> [the defendant's] goods, services, or commercial activities by [plaintiff]."  15 U.S.C. §
> 1125(a)(1)(A).

*Id.* at 406-07 (footnote and citations omitted).

The first thing the plaintiff must show, then, is that its mark is entitled to protection.  A

registered trademark, such as "NYSEG," that has been in continuous use for at least five years, is

presumptively valid and entitled to protection.  15 U.S.C. § 1065; *Malletier v. Burlington Coat*

*Factory Warehouse Corp.* ("*Burlington*"), 426 F.3d 532, 534-35 (2d Cir. 2005).[3]  *See also Lois*

---

[3]"'Incontestability' does not, however, mean that a mark is unassailable.  For example,
the owner of an 'incontestable' registered mark may still lose rights in the mark if it is shown, for
instance, that the mark was fraudulently registered, or that it was abandoned through three or
more continuous years of non-use." *Burlington*, 426 F.3d at 535 n.1 (citing 15 U.S.C. § 1115).

*Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("registered trademarks are presumed to be distinctive and should be afforded the utmost protection").

"[T]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  In other words, "an unregistered mark is entitled to protection under the Lanham Act if it would qualify for registration as a trademark." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir.), *cert. denied*, 547 U.S. 1019 (2005).

In determining whether an unregistered mark is entitled to protection, the Court considers "Judge Friendly's classic formulation in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976)." *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 489 (2d Cir. 1988).  That formulation "set[s] forth four categories of terms, each one conferring a differing degree of eligibility for trademark protection.  'Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.'" *Kensington Pub. Corp. v. Gutierrez*, No. 05 Civ. 10529, 2009 WL 4277080, at *2 (S.D.N.Y. Nov. 10, 2009) (quoting *Abercrombie & Fitch*, 537 F.2d at 9) (additional internal quotation marks omitted).

Generic marks, which "consist[] of words identifying the relevant category of goods or services[,] ... are not at all distinctive and thus are not protectable under any circumstances." *Star Indus.*, 412 F.3d at 384-85.  Descriptive marks "consist of words identifying qualities of the

product.  They are not inherently distinctive, but are protectable provided they have acquired secondary meaning ... ."  *Id.*

Both suggestive marks and arbitrary or fanciful marks are "inherently distinctive."  *Id.* "Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product through the use of 'imagination, thought and perception.'"  *Id.* (quoting *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 118 (2d Cir. 1999)) (additional internal quote and citation omitted).  Arbitrary or fanciful marks "do not communicate any information about the product either directly or by suggestion."  *Id.*

Whereas a generic mark is never entitled to protection, a descriptive mark "is eligible for protection if it has become distinctive of the producer's goods in commerce.  This distinctiveness is generally called secondary meaning."  *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F.Supp. 279, 292 (S.D.N.Y. 1997).  "Indeed, the United States Patent and Trademark Office does not permit registration of a descriptive mark unless it has attained secondary meaning."  *Kensington Pub.*, 2009 WL 4277080, at *3 (citing *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 94 (2d Cir. 2001)).  *See also Dooney*, 454 F.3d at 116 ("To qualify for registration under § 2, or to establish protectability under § 43(a), 'a mark must be sufficiently 'distinctive' to distinguish the registrant's goods from those of others") (quoting *Star Indus.*, 412 F.3d at 381).

A mark develops secondary meaning (sometimes referred to as "acquired distinctiveness," *see Star Indus.*, 412 F.3d at 385), "when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'"  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood*

*Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, n.11 (1982)). *See also Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995) ("Secondary meaning attaches when 'the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business'") (quoting *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir. 1990)).

If the plaintiff succeeds in showing that its mark is entitled to protection, then the issue becomes whether "the defendant's use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship of the defendant's goods with plaintiff's goods." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). *See Savin Corp. v. Savin Group*, 391 F.3d 439, 456 (2d Cir. 2004) ("The crucial issue in an action for trademark infringement ... is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question") (internal quotation marks omitted), *cert. denied*, 546 U.S. 822 (2006); *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 128, 130 (2d Cir. 2004) (describing the likelihood of consumer confusion a "[t]he key for a plaintiff in proving infringement of its trademark" and "the pivotal question" in trademark infringement cases).

"[A] 'plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury.'" *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246 (2d Cir. 2009) (quoting *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005)). *See also Brennan's*, 360 F.3d at 129 (" In a trademark infringement case, proof of a likelihood of confusion establishes both a likelihood of

success on the merits and irreparable harm"). Thus, if the plaintiff can establish a likelihood of consumer confusion, it will typically be entitled to injunctive relief, absent some countervailing circumstances. *See, e.g.*, *Philip Morris USA Inc. v. A & V Minimarket, Inc.*, 592 F.Supp.2d 669, 675 (S.D.N.Y. 2009); *Protection One Alarm Monitoring, Inc. v. Executive Protection One Security Service, LLC.*, 553 F.Supp.2d 201, 206-07 (E.D.N.Y. 2008); *cf. Weight Watchers Int'l*, 423 F.3d at 144 (plaintiff's undue delay in seeking injunction may warrant denial of relief).


## II. NYSEG's Claims

## A. Protectability of NYSEG's Marks

In the case at bar, USG&E does not dispute that plaintiff's acronym "NYSEG" and the logo associated with that acronym are valid, registered marks that are entitled to protection. *See* Def. Mem. of Law (Dkt. #12) at 7-8. USG&E does contend, however, that plaintiff's full name, "New York State Electric & Gas," is merely descriptive, and therefore not entitled to any protection. In response, NYSEG does not appear to dispute defendant's characterization of plaintiff's name as descriptive, but contends that "[t]here can be no question" that the name "New York State Electric & Gas" has developed secondary meaning. Plaintiff's Mem. of Law (Dkt. #7-2) at 6.

The Second Circuit has explained that

[a]cquired distinctiveness, as opposed to inherent distinctiveness, refers to the recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services. When there is widespread recognition of a mark among consumers, there is an increased likelihood that consumers will assume it identifies the previously familiar user, and therefore an increased likelihood of consumer confusion if the new user is in fact not related to the first.

*Playtex Products, Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 163 (2d Cir. 2004) (internal quotation marks and citations omitted).

"The existence of secondary meaning is an inherently factual inquiry ... ." *Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir. 1987). As such, it may present factual issues that need to be resolved by a jury. *See Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 991 (9th Cir. 2006) ("Whether a claimed mark has obtained a secondary meaning is a question of fact to be determined by a jury"); *Igloo Products Corp. v. Brantex, Inc.*, 202 F.3d 814, 818 (5th Cir. 2000) (district court "correctly found that the question of secondary meaning was a question of fact to be determined by the jury"). *See, e.g., Two Pesos, Inc.*, 505 U.S. at 766 (discussing jury findings on issue of secondary meaning); *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 68-69 (2d Cir. 1994) (same).

There are "six factors classically recognized as relevant" to whether a mark has attained secondary meaning, *ITC Ltd. v. Punchgini, Inc.*, 518 F.3d 159, 162 (2d Cir. 2008). Those are: "(1) the senior user's advertising expenditures, (2) consumer studies linking the name to the source, (3) sales success, (4) unsolicited media coverage of the product, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Yarmuth-Dion*, 835 F.2d at 993; a*ccord Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n.4 (2d Cir. 1997).

At this point, there is not a great deal of evidence in the record concerning most of these factors. It is clear that NYSEG has exclusively used its full name for many years, which is unsurprising, since deregulation of the energy utility industry in New York, which allowed competitors such as USG&E to enter the market, did not occur until the late 1990s. *See Astoria*

*Gas Turbine Power, LLC v. Tax Comm'n of City of New York*, 7 N.Y.3d 451, 454 (2006).

Evidence of long-term, continuous, exclusive use is significant evidence of secondary meaning.

*See*, *e.g.*, *International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 370 (4th Cir. 2003) (district court did not err in finding that company had shown that its mark had achieved secondary meaning, based in part on evidence of "a long history of continuous, if not exclusive, use of the mark"), *cert. denied*, 540 U.S. 1106 (2004); *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 295 (7th Cir. 1998) ("An additional factor that is important in determining secondary meaning ... is the time, if any, that T & B continuously and exclusively produced" the products that were the subject of its trade dress infringement claim); *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995) ("five years' use is a strong factor in favor of secondary meaning"); *see also* 15 U.S.C. § 1052(f) (requiring five years of continuous and exclusive use to establish prima facie evidence of the development of secondary meaning of descriptive marks).

Given NYSEG's seventy-plus years of continuous, exclusive use of the name "New York State Electric and Gas," it would be surprising if its customers had not come to think of that name not simply as describing NYSEG's products–electricity and natural gas–but as identifying the source of that product, *i.e.*, NYSEG itself. Although little has been pleaded or presented to the Court concerning the other *Abercrombie & Fitch* factors, most of those factors are of diminished relevance or probative value here, given the fact that for much of its history, NYSEG operated in what amounted to a legal monopoly. *See Montalvo v. Consolidated Edison Co. of New York, Inc.*, 92 A.D.2d 389, 394 (1st Dep't 1983) (noting "Con Ed's monopoly status within

its franchise area"); *Rochester Gas and Elec. Corp. v. Public Service Comm'n*, 66 A.D.2d 509, 512 (3d Dep't 1979) (stating that "[p]rivate electrical companies are protected in New York State from unlicensed competition," and that they have "monopolistic control of the desired service" within their prescribed area).  It would make little sense, for example, to consider NYSEG's "sales success" prior to energy deregulation, since its customers had little choice but to use NYSEG for their energy needs.

I conclude, therefore, that NYSEG has sufficiently pleaded facts showing a secondary meaning in its name, "New York State Electric & Gas," to survive a motion to dismiss under Rule 12(b)(6).  *See Courtenay Communications Corp. v. Hall*, 334 F.3d 210, 214 (2d Cir. 2003) (plaintiff's allegations, "although imprecise, ... [we]re sufficient to allege that [its] mark [wa]s distinctive," either inherently or by having acquired secondary meaning); *The Pet Stop Professional Pet Sitting Service, LLC v. The Professional Pet-Sitting Service, Inc.*, No. 07-90, 2007 WL 1876517, at *8 (D.Or. June 26, 2007) (denying defendant's motion to dismiss § 43(a) claim on ground that whether plaintiff's marks were descriptive presented a question of fact that could not be decided on a motion to dismiss); *In re Connecticut Mobilecom, Inc.*, No. 02-12725, 2003 WL 23021959, at *10 (S.D.N.Y. Dec. 23, 2003) ("the issue of whether a trade name has acquired secondary meaning is a question of fact and therefore not appropriately decided on a motion to dismiss").

I also conclude that NYSEG has established a substantial likelihood of success on this issue.  Again, it is difficult to imagine that after some seven decades of plaintiff's continuous, exclusive use of its name, during much of which period NYSEG was the only electricity and gas

supplier available to customers within its designated service areas, customers would not have

come to associate that name with NYSEG itself, and not just with the products that they were

purchasing from NYSEG. *See Ferrellgas Partners, L.P. v. Barrow*, 143 Fed.Appx. 180, 189

(11th Cir. 2005) (evidence demonstrated a substantial likelihood that plaintiff could prove that its

mark had acquired secondary meaning, where the mark had been in continuous use in the

relevant area for over 35 years); *Sunbeam Products, Inc. v. West Bend Co.*, 123 F.3d 246, 259 (5th

Cir. 1997) ("Sunbeam established a substantial likelihood of success on the merits of its trade

dress infringement claim ... , particularly given the statutory presumption that the substantially

continuous and exclusive use of a particular mark or dress for over five years raises an inference

of secondary meaning"), *overruled on other grounds by Eppendorf-Netheler-Hinz GMBH v.

Ritter GMBH*, 289 F.3d 351 (5th Cir. 2002).

In addition, "[a]ctual confusion shows at least some amount of secondary meaning ... ."

*Vision Center Northwest, Inc. v. Vision Value LLC*, No. 07-CV-183, 2007 WL 3256647, at *5

(N.D.Ind. Nov. 1, 2007) (citing *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 381 (7th

Cir. 1976)); *see also Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149

F.3d 722, 728 (7th Cir. 1998) ("Actual confusion logically must be an indication of at least some

amount of secondary meaning") (Wood, J., dissenting); *Charles Jacquin Et Cie, Inc. v. Destileria

Serralles, Inc.*, 921 F.2d 467, 472 n.5 (3d Cir. 1990) ("Necessarily, a package or mark must have

acquired secondary meaning before likelihood of confusion can result"); *Devan Designs, Inc. v.

Palliser Furniture Corp.*, No. 2:91CV00512, 1992 WL 511694, at *12 (M.D.N.C. Sept. 15,

1992) ("In order to establish a likelihood of confusion, one must, by necessity, first demonstrate

the presence of secondary meaning"). NYSEG has presented some evidence of actual confusion, which is discussed below.

**B. Consumer Confusion**

**1. General Principles**

As Circuit Judge Cardamone put it in *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1225 (2d Cir. 1987), the likelihood-of-confusion issue "is like a tangle of underbrush. Fortunately, a path has been hewn through this thicket." That path was hewn by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), in which the court set forth a multifactor balancing test. Those factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the proximity of the products; (4) the likelihood that the senior user of the mark will "bridge the gap"[4]; (5) evidence of actual confusion; (6) the junior user's bad faith *vel non* in adopting the mark; (7) the quality of the junior user's product; and (8) the sophistication of the relevant consumer group. *Id.* at 495. "No single factor is dispositive, nor is a court limited to consideration of only these factors." *Brennnan's*, 360 F.3d at 130 (citing *Polaroid*, 287 F.2d at 495). "Further, 'each factor must be evaluated in the context of how it bears on the

---

[4]"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus.*, 412 F.3d at 387 (citation omitted). When the parties' products "are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in [such a] case." *Id.* (citations omitted).

ultimate question of likelihood of confusion as to the source of the product.'" *Brennan's*, 360 F.3d at 130 (quoting *Lois Sportswear*, 799 F.2d at 872).

In addition, the Court must bear in mind that it is the plaintiff's burden to "prove ... a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers," in order to establish a likelihood of confusion. *Star Indus.*, 412 F.3d at 383. At the same time, however, "actual confusion is not necessary to establish a likelihood of confusion ... ." *Starbucks*, 588 F.3d at 117 (citing *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988)). *See also Savin Corp.*, 391 F.3d at 459 ("[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source") (quoting *Lois Sportswear*, 799 F.2d at 875).

Although the likelihood-of-confusion question can involve factual issues, where the relevant facts are not in dispute, it is appropriate for the court to make that determination as a matter of law. For example, in *Lois Sportswear*, 799 F.2d at 876, the Second Circuit stated that "[w]hile ... most trademark cases revolve around the fact question of likelihood of confusion as to source," the court there found "no dispute as to the *material* facts concerning the controlling likelihood of confusion issues. ... The only issue the parties dispute is the application of these facts to the *Polaroid* test and likelihood of confusion analysis. This is a legal issue which was appropriate for the district court to resolve on summary judgment." *See also Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 194-95 (3d Cir. 1990) (reversing district court's denial of Lanham Act plaintiff's motion for preliminary injunction, and directing

entry of preliminary injunction on remand, where there was no dispute as to facts relevant to likelihood of consumer confusion).

## 2. Similarity of the Marks

"The similarity of the marks is a key factor in determining likelihood of confusion." *Dooney*, 454 F.3d at 117; *see also Burlington*, 426 F.3d at 537 ("Of salient importance among the *Polaroid* factors is the 'similarity of the marks' test"). That is particularly true when the plaintiff and defendant are engaged in the same type of business. *See Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 26 (1st Cir. 2008) ("Where the parties are direct competitors, the most important factor ... is the similarity-of-marks inquiry"); *accord A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000). "To apply this factor, courts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the 'totality of factors that could cause confusion among prospective purchasers.'" *Burlington*, 426 F.3d at 537 (quoting *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993)).[5]

This "'similarity of the marks' test–especially when the comparison is between marks on identical product types ... does not require an *identity* of marks." *Burlington*, 426 F.3d at 538 n.3. Although the degree of similarity that is required will vary depending on a number of factors, such as the particular products at issue and the nature of the marketplace in which they

---

[5]As stated, NYSEG and USG&E are different types of energy suppliers. NYSEG is a regulated utility company. USG&E is an ESCO that, within NYSEG's service area, is, in effect, a middleman between NYSEG and the consumer. Nevertheless, they are direct competitors to the extent that they both seek to be the energy supplier of choice for end users.

are advertised and sold, in general the marks "need not be identical, but only similar, for there to be a likelihood of confusion." *Id.  See also Dooney*, 454 F.3d at 117 ("Courts should keep in mind that in this context the law requires only confusing similarity, not identity").

The Second Circuit has also stressed on more than one occasion that "to determine whether two products are confusingly similar it is improper to conduct a side-by-side comparison in lieu of focusing on actual market conditions and the type of confusion alleged." *Dooney*, 454 F.3d at 112 (citing *Burlington*, 426 F.3d 532).  The court explained that "[u]tilizing a side-by-side comparison can be a useful 'heuristic means of investigating similarities and differences in ... respective designs,' so long as a court maintains a 'focus on the ultimate issue of the likelihood of consumer confusion.'" *Dooney*, 454 F.3d at 117.  The reason for this is simple: "[t]hough two products may be readily differentiated when carefully viewed simultaneously, those same products may still be confusingly similar in the eyes of ordinary consumers encountering the products individually under typical purchasing conditions, and that 'real world' confusion is the confusion that the Act seeks to eliminate." *Burlington*, 426 F.3d at 539.

In short, it would be "inappropriate[ to] focus[] on the similarity of the marks in a side-by-side comparison instead of when viewed sequentially in the context of the marketplace." *Dooney*, 454 F.3d at 117.  The question that the court should concentrate on is "whether [the competing marks] create the same general overall impression," such that a consumer who is familiar with the plaintiff's mark would likely be confused when seeing the defendant's mark alone. *Id.* at 538.  *See also Savin Corp.*, 391 F.3d at 458 ("the crux of the issue is whether the

similarity is likely to cause confusion among numerous customers who are ordinarily prudent")
(internal quotation marks omitted).

In the case at bar, the Court first considers whether NYSEG's full name, "New York
State Electric & Gas," and the challenged name, "New York Gas & Electric," which NYSEG
seeks to enjoin USG&E from using, are confusingly similar. I find that they are. The only
differences between them are the omission of the word "State" in the latter, and the transposition
of the words "Electric" and "Gas." In the real-world context in which consumers are apt to hear
or see those names individually, those differences hardly seem substantial. *See Shields v.
Zuccarini*, 254 F.3d 476, 483 (3d Cir. 2001) (finding that plaintiff's and defendant's internet
domain names were confusingly similar, where defendant's domain names "closely resemble[d]"
plaintiff's, and differed only because they contained "a few additional or deleted letters, or ...
rearrang[ed] the order of the words"). *See also Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
746 F.2d 112, 116 (2d Cir. 1984) (although "[q]uestions regarding the likelihood of confusion
are normally factual in nature[,] ... 'courts retain an important authority to monitor the outer
limits of substantial similarity within which a jury is permitted to make the factual determination
whether there is a likelihood of confusion as to source'") (quoting *Warner Bros. Inc. v. American
Broadcasting Cos.*, 720 F.2d 231, 246 (2d Cir. 1983)).

With respect to the parties' "NYSEG" and "NYG&E" acronyms and logos, I believe that
the "similarity" factor also weighs in plaintiff's favor, albeit to a lesser extent. The acronyms
themselves share some obvious similarities; both begin with "NY," with the letters "E" and "G"

following.  At the same time, however, the particular combination "SEG" is only slightly similar to "G&E."

Again, though, "[i]n deciding whether the marks are similar as used," the Court must "not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace."  *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 962 (2d Cir. 1996).  The reality is that consumers are likely, when they see these marks, to associate the letters "E" and "G" with the words that they stand for in the parties' names, *i.e.*, "Electric" and "Gas." Similarly, although only defendant's acronym contains an ampersand, consumers who are familiar with NYSEG's full name may well be mindful that plaintiff's name does contain an ampersand:  "New York State Electric & Gas."  Simply reversing the sequence of the letters "E" and "G," and inserting an ampersand, thus does not render defendant's acronym dissimilar from plaintiff's.  *Shields v. Zuccarini*, 254 F.3d at 483; *see also Crystal Corp. v. Manhattan Chem. Mfg. Co.*, 75 F.2d 506, 507-09 (Cust & Pat.App. 1935) (finding that challenged mark, "T.Z.L.B.," was confusingly similar to appellant's registered mark for the same type of product, "Z.B.T."); *Kadant, Inc. v. Seeley Machine, Inc.*, 244 F.Supp.2d 19, 29 (N.D.N.Y. 2003) (finding that customers could easily be confused by similarity between plaintiff's "AES" mark and defendant's "APS" mark, particularly since plaintiff and defendant were both in the same type of business in the same geographic area).

The parties' logos, viewed side by side, are dissimilar in several respects.  The registered trademark for NYSEG's logo states that "[t]he mark consists of the stylized letters 'N', 'Y', 'S',

'E' and 'G'." Dkt. #10-2 at 5. As depicted on the registration, those letters are written in sans serif capitals, in bold outline form, which are italicized or slanted upward toward the right:



*Id.*

The stylized form that defendant has been using for its logo, on the other hand, consists of the acronym "NYG&E," in white capital letters, in a different font from plaintiff's, set against a blue background:



Dkt. #12 at 6. The logo also includes the name "New York Gas & Electric" across the bottom.

Thus, these logos do differ from each other in several respects, although it must again be borne in mind that the extent to which they are similar should not be assessed based simply on a direct, simultaneous comparison. Though the Court does not mean to minimize the differences between the two logos, those differences might be less apparent to a consumer viewing them at different times, independently of each other.[6]

---

[6]Defendant states in its brief that "[p]laintiff's Logo consists of the name 'NYSEG' in italic white letters, surrounded by a bright orange outline ... ." Dkt. #12 at 6. As depicted on its website, http://www.nyseg.com/, plaintiff's logo is outlined in orange. *See Energy Automation*

(continued...)

### 3. Strength of Plaintiff's Marks

The Second Circuit has explained that "[t]he strength of a mark is determined by its tendency to uniquely identify the source of the product. This tendency is strong to the extent that the mark is distinctive, either inherently or by virtue of having acquired secondary meaning." *Star Indus.*, 412 F.3d at 384; *accord Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 217 (2d Cir. 2003). *See also Savin Corp.*, 391 F.3d at 457 ("[T]he strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public") (additional internal quotation marks omitted); *Brennan's*, 360 F.3d at 130 ("The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis").

"Determination of strength ... begins with inquiry as to whether the mark has the inherent distinctiveness that would entitle it to protection in the absence of secondary meaning. Marks are classified, in ascending order of strength, as '(1) generic; (2) descriptive; (3) suggestive; [or] (4) arbitrary or fanciful.'" *Star Indus.*, 412 F.3d at 384-85 (quoting *TCPIP Holding Co. v. Haar Communications, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001)). "Once a mark has been classified, the second step in determining strength is to consider its degree of distinctiveness, an inquiry that concerns both the 'inherent inventiveness of the mark itself and the amount of third-party usage

---

[6](...continued)
*Systems, Inc. v. Saxton*, 618 F.Supp.2d 807, 810 n.1 (M.D.Tenn. 2009) ("A court may take judicial notice of the contents of an Internet website") (*citing City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468, 472, n. 1 (6th Cir. 2004), *amended and superseded on other grounds*, 399 F.3d 651 (6th Cir. 2005)). *See, e.g., Dudley v. HealthSource Chiropractic, Inc.*, 585 F.Supp.2d 433, 446 (W.D.N.Y. 2008). There is no indication in the registered trademark, however, that color was claimed as a feature of the mark. While the parties' use of particular colors for their logos does have some relevance to whether the logos are confusingly similar, then, the fact that they use different colors is not dispositive of whether plaintiff's mark has been infringed.

of the term as a mark, especially in the market in question.'" *Id.* (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:81, at 11:159 (2005)).

To some extent, this factor has already been discussed in terms of the protectability of plaintiff's marks, *supra*. *See Time, Inc.*, 173 F.3d at 117 ("In somewhat circular fashion, consideration of this [strength] factor includes an evaluation of the same characteristics that initially determined a mark's validity: inherent distinctiveness, descriptiveness, and secondary meaning"). For the reasons stated above, I conclude that plaintiff's marks all have some distinctiveness, either inherently or by having acquired secondary meaning, and therefore that they have at least some appreciable strength.

The Court recognizes, though, that a finding of protectability alone is not determinative of a mark's strength. *See 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 247 Fed.Appx. 232, 233-34 (2d Cir. 2007) ("the strength of a descriptive mark made incontestably distinctive for protectability purposes by registration for more than five years is a matter also properly considered by a trial court on the issue of likelihood of confusion") (quoting *Gruner + Jahr*, 991 F.2d at 1078). Some further examination of this factor is therefore warranted.

As stated, plaintiff appears to concede that its full name, "New York State Gas & Electric," is descriptive; NYSEG's argument concerning the strength of its name focuses entirely on the issue of secondary meaning. *See* Dkt. #21 at 11-14; *see also Brennan's*, 360 F.3d at 131 (descriptive mark is protectable only if it has acquired secondary meaning). In that regard, the Court has found that plaintiff's decades-long, exclusive use of its name does weigh in favor of a finding of secondary meaning. Nonetheless, the fact remains that this name *is* descriptive,

inasmuch as it describes what plaintiff sells–natural gas and electricity–and where plaintiff sells it:  New York State.  Evidence of other factors bearing upon secondary meaning, such as NYSEG's advertising expenditures, consumer studies, media coverage, and so on, is for the most part not in the record before me at this time.  At this point, then, this unregistered mark has been shown to be of no more than moderate strength.  *See TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 100 (2d Cir. 2001) (Lanham Act "allow[s] descriptive marks ... a minimal scope of protection, upon establishing that the mark ha[s] acquired a secondary meaning as a designator of source").

The acronym "NYSEG" and its stylized logo are plainly stronger marks.  For one thing, they are registered, the former mark for over ten years.  "[A]n incontestible registered trademark enjoys a conclusive presumption of distinctiveness."  *Savin Corp.*, 391 F.3d at 457 (citing *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 204-05 (1985)).  *See also Time, Inc.*, 391 F.3d at 118 ("Registration allows a merely descriptive mark to become incontestable on the basis of lack of secondary meaning").

At this point, I also believe that "NYSEG" is a suggestive, rather than descriptive, mark.  "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods.  A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods."  *Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1341 (2d Cir. 1992) (quoting *Abercrombie & Fitch*, 537 F.2d at 11).

 That the letters of the acronym stand for words that are themselves descriptive does not mean that the acronym is likewise descriptive.  Although "NYS" probably connotes "New York

State" to most adults rather quickly, the combination "EG" does not seem likely to *immediately* convey to a person that it refers to electricity and gas. *See Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road Dawgs, Inc.*, ___ F.Supp.2d ___, 2009 WL 5385987, at *9 (N.D.N.Y. Dec. 30, 2009) ("If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness") (quoting McCarthy on Trademarks § 11:67 at 11-129-30 (2006)). *See, e.g., Anheuser-Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 641-42 (8th Cir. 1984) (stating that an acronym is suggestive if "some operation of the imagination is necessary to equate the initials with the product"); *Vertos Medical, Inc. v. Globus Medical, Inc.*, No. C 09-1411, 2009 WL 3740709, at *5 (N.D.Cal. Nov. 6, 2009) (finding that "MILD," which stood for generic phrase "minimally invasive lumbar decompression," "d[id] not suggest anything to do with spinal surgery," and therefore was properly classified as "arbitrary"); *Operation Able of Greater Boston, Inc. v. National Able Network, Inc.*, 646 F.Supp.2d 166, 176 (D.Mass. 3, 2009) (concluding that mark "ABLE," for "Ability Based on Long Experience," was suggestive, and "at least moderately strong"); *Savannah College of Art and Design, Inc. v. Houeix*, 369 F.Supp.2d 929, 931-32 (S.D.Ohio 2004) ("The SCAD mark is distinctive and arbitrary ... in as much as it is an acronym for the college's full name, 'Savannah College of Art and Design'"); *but see Finance Express LLC v. Nowcom Corp.*, 564 F.Supp.2d 1160, 1170 (C.D.Cal. 2008) ("'TrackerDMS' is also descriptive because 'DMS' is merely an acronym for 'Dealer Management Software,' which clearly describes Finance Express' product").[7]

---

[7]At least some of the cited cases involve decisions made after a trial or evidentiary

(continued...)

Likewise, the stylized form of plaintiff's mark is distinctive and also relatively strong. Even an otherwise weak mark–which "NYSEG" is not–may be strong if given a distinctive, stylized appearance. *See*, *e.g.*, *Patsy's*, 317 F.3d at 217 (although a personal name alone "is generally weak unless there is evidence of secondary meaning ..., a personal name rendered in a distinctive lettering style may be considered strong even without a showing of secondary meaning"); *Gruner + Jahr*, 991 F.2d at 1077-78 (holding the otherwise descriptive mark PARENTS to be strong in its stylized form).

## 4. Remaining Factors

Most of the remaining factors relevant to the issue of consumer confusion–the proximity of the products, "bridging the gap," and so on–either have little or no relevance here, *see Starbucks Corp.*, 588 F.3d at 115 ("when products are in direct competition, ... the bridging factor is irrelevant to the *Polaroid* analysis") (internal quotation marks and alterations omitted), do not appear to be in dispute at this point (such as the quality of USG&E's product), or have not been fully fleshed out by evidence, at this early stage of the case.

NYSEG has submitted some evidence of actual consumer confusion. There is evidence, for example, that an online trade publication, *Restructuring Today*,

---

[7](...continued)
hearing, neither of which has yet occurred in this case. While I do not reach any definitive conclusions on these matters at this point, then, I do believe that plaintiff has pleaded sufficient facts in this regard to survive a motion to dismiss, and that these factors weigh in plaintiff's favor with respect to the likelihood that plaintiff will succeed on the merits of its claims, for purposes of deciding NYSEG's motion for a preliminary injunction.

http://www.restructuringtoday.com (available by subscription only), ran a correction on

December 3, 2009, stating:

> In an article published yesterday about the change of branding for US Gas & Electric in New York to New York Gas & Electric ... we regret having made an error in the placement of an abbreviation – that may have heightened confusion as it attempted thwart it [sic]. The new name, we said, New York Gas & Electric (NYG&E) should not be confused with the utility New York State Electric & Gas (NYSEG) yet we placed a correct abbreviation after the wrong name.

Dkt. #7-11.

In support of its motion for an injunction, NYSEG has also submitted evidence that on

one occasion in mid-February 2010, a New York customer of USG&E mistakenly called

NYSEG's customer service department to complain about his rates, and that the customer

displayed some confusion about whether NYSEG and NYG&E were the same entity. *See* Dkt.

#30-8. Plaintiff has also submitted a transcript of a telephone call from another consumer to

NYSEG's customer service department on February 24, 2010, in which the consumer–who lived

within one of NYSEG's designated service areas–said that she had been contacted by someone

who "said they were from New York Gas ...," concerning some credits that were supposedly due

her. Dkt. #39-3 at 3. The toll-free number that the representative gave the consumer, according

to NYSEG, has been traced to an affiliate of USG&E named ESPI. *See* Decl. of Marc Webster

(Dkt. #39-2) ¶ 2.

Although there is authority that "isolated instances of confusion ... is [sic] insufficient to

establish a likelihood of confusion," *Atlantic Richfield Co. v. Arco Globus Int'l Co.*, No. 95 Civ.

6361, 1997 WL 607488, at *8 (S.D.N.Y. May 29, 1997), it bears repeating that this case is in its

early stages, and that the only questions before the Court at this juncture are whether NYSEG's

complaint is facially sufficient to withstand a motion to dismiss, and whether NYSEG has

demonstrated enough on the merits (along with the other relevant factors) to entitle it to a

preliminary injunction.  I find that NYSEG has done so, particularly since a showing of actual

confusion is not a *sine qua non* of a Lanham Act claim in the first place.  *See Starbucks*, 588 F.3d

at 117 ("actual confusion is not necessary to establish a likelihood of confusion").

On the record as it now stands, I also cannot find that USG&E has acted in bad faith in

adopting the NYG&E mark.  Although plaintiff contends that USG&E's adoption of that mark is

a transparent attempt to imitate NYSEG's mark, and, at first blush, that appeared to be so,

defendant has presented evidence that its use of the NYG&E mark has been consistent with its

branding strategy in other states, in which USG&E had simply prefaced "Gas & Electric" with

the name of the relevant state, and that it has also used the corresponding anagram or

abbreviation.[8]

The sophistication of the relevant consumer group weighs in plaintiff's favor, in the sense

that the market for the parties' services includes virtually all households within their areas of

operation, other than those relative few that are living "off the grid," *i.e.*, that do not get their

---

[8]At oral argument on the pending motions, defense counsel made the assertion that "about two years ago U.S. Gas & Electric began to adopt a family of marks for itself throughout the country" using "the initials G & E ... preceded by the initials of the state they were entering or servicing."  Tr. (Dkt. #36) at 10.  Counsel displayed some exhibits in support of that assertion, which, he stated, were not in the record at that point.  *Id.*  A look at USG&E's website, however, does indicate that counsel's assertion is correct.  *See* http://www.usgande.com/markets/usgande/.  *See also Muller-Paisner v. TIAA*, 289 Fed.Appx. 461, 466 n.5 (2d Cir. 2008) (taking judicial notice of defendant's website for the fact of its publication); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F.Supp.2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination") (quotation omitted).

energy from a utility company. The relevant consumer group, in other words, is not narrow or specialized, and, almost by definition, most of the parties' actual or potential customers would have no more than an average layperson's understanding of the differences between regulated public utilities and ESCOs in New York State.

I conclude, then, that plaintiff has alleged sufficient facts to withstand defendant's motion to dismiss. The next question is whether to grant NYSEG's motion for a preliminary injunction.


### III. USG&E's Motion to Strike NYSEG's Motion for a Preliminary Injunction

Before considering NYSEG's motion for a preliminary injunction, the Court must address defendant's motion to strike that motion. In support of its motion to strike, USG&E contends that NYSEG has knowingly misstated to this Court that defendant is currently using the challenged marks in the geographic area in which plaintiff operates. According to defendant, that assertion is demonstrably untrue, and NYSEG knew that it was false when it made that allegation to the Court.

Motions to strike are generally looked upon with disfavor. *Rochester-Genesee Regional Transp. Authority v. Hynes-Cherin*, 531 F.Supp.2d 494, 519 (W.D.N.Y. 2008). I see no reason here to depart from that general reluctance to grant such motions. For one thing, as stated, plaintiff has submitted some evidence that USG&E *has* referred to itself as "New York Gas," or some similar name, in telephone calls to consumers within NYSEG's territory. *See* Dkt. #39-2 ¶ 2.

Second, in this era in which companies do much of their business over the internet, particularly via their web pages, it is of limited relevance whether USG&E has been soliciting customers under the "NYG&E" mark within NYSEG's service area by more traditional means, such as telephone calls, billboards, print ads, and the like. The fact is that customers within NYSEG's designated service areas may visit USG&E's website, http://www.usgande.com, where they are given a choice of links to follow for the seven states in which USG&E currently operates. Clicking on the link for New York takes the user to a page with the logo, "NYG&E" prominently displayed at the top. There is a line near the bottom of the page stating, "If you are in the NYSEG and RG&E service areas, please click here," but that link simply takes the user back to USG&E's home page, which itself includes a rotating display of images of its various state utilities, including NYG&E.[9]

Third, I see no unfair prejudice here resulting from the filing or existence of NYSEG's motion for a preliminary injunction. If that motion were ultimately shown to have no basis in fact, then the Court would simply deny the motion. For the reasons stated above, I conclude that NYSEG is entitled to a preliminary injunction, but regardless of how the proof ultimately develops, I see no need to strike NYSEG's motion. *See Citigroup, Inc. v. Wachovia Corp.*, 613 F.Supp.2d 485, 489 (S.D.N.Y. 2009) (motions to strike are generally disfavored and will be denied unless the matter sought to be struck is "significantly prejudicial" to one of the parties).

---

[9]It appears that at some time in the recent past, the "New York" link on USG&E's website may have taken users to one or more different pages, including a "Request-A-Quote" page. *See* Dkt. #30 at 9. Regardless, it is clear that users within plaintiff's service area are, and have been, able to go to USG&E's website and see the "NYG&E" logo prominently displayed.

## IV. NYSEG's Motion for a Preliminary Injunction

"[A] 'plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury.'" *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246 (2d Cir. 2009) (quoting *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005)). *See also Brennan's*, 360 F.3d at 129 (" In a trademark infringement case, proof of a likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm"). Thus, if the plaintiff can establish a likelihood of consumer confusion, it will typically be entitled to injunctive relief, absent some countervailing circumstances, such as undue delay in seeking injunctive relief. *See*, *e.g.*, *Philip Morris USA Inc. v. A & V Minimarket, Inc.*, 592 F.Supp.2d 669, 675 (S.D.N.Y. 2009); *Protection One Alarm Monitoring, Inc. v. Executive Protection One Security Service, LLC.*, 553 F.Supp.2d 201, 206-07 (E.D.N.Y. 2008); *cf. Weight Watchers Int'l*, 423 F.3d at 144 (plaintiff's delay in seeking injunction may warrant denial of relief).

Based on the pleadings and the limited record before me, I believe that plaintiff is entitled to preliminary injunctive relief. While NYSEG has not yet definitively established that USG&E has infringed its marks, for the reasons stated above I find that NYSEG has demonstrated that it is likely to succeed on the merits of its infringement claims, which gives rise to a presumption of irreparable harm. *See Federal Express Corp.*, 201 F.3d at 174 (2d Cir. 2000) ("proof of a likelihood of confusion would create a presumption of irreparable harm, and thus a plaintiff would not need to prove such harm independently"); *see also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997) (noting that "[d]efendants concede irreparable

harm would result if plaintiff demonstrates its Lanham Act claim is likely to succeed"); *Dudley v. HealthSource Chiropractic, Inc.*, 585 F.Supp.2d 433, 447 (W.D.N.Y. 2008) ("A presumption of irreparable harm arises in Lanham Act cases once the plaintiff establishes likelihood of success on its claim").

Even aside from that presumption, NYSEG has demonstrated a likelihood of irreparable injury in the absence of such an injunction. Consumer confusion could lead to a loss of customers and business, which might be hard to quantify, since it could be difficult to determine how many customers had been affected, or precisely how they had been affected, by the similarity between plaintiff's and defendant's marks. Such confusion could also lead to a loss of customer goodwill, as evidenced by the transcript submitted by NYSEG of one customer's telephone call to NYSEG in which the customer expressed some frustration or exasperation with what he termed "you people," where it appeared that the customer was under the belief that he was speaking to NYG&E. Dkt. #30-8.

While I have already found a likelihood that NYSEG will succeed on the merits of its claims, I also conclude that, at the very least, there are sufficiently serious questions going to the merits to make them a fair ground for litigation, plus a balance of hardships tipping decidedly toward NYSEG. The Court's injunction will not prevent USG&E from continuing to do business in New York State, even within NYSEG's designated service areas as it has done in the past, prior to its rebranding decision. USG&E will simply be prohibited, for the time being at least, from using the marks "New York Gas & Electric" and "NYG&E." It does not appear that

such an order would impose an especially onerous burden on defendant, which will still be free to operate in New York using its name, "United States Gas & Electric," and the "USG&E" mark.

I also note that, while the parties do dispute certain facts here, particularly concerning the extent to which USG&E has been using the challenged marks within NYSEG's service area, many of the relevant issues are either legal rather than factual in nature, or involve undisputed facts that demonstrate NYSEG's entitlement to preliminary injunctive relief. At oral argument on the parties' motions, for example, defense counsel agreed that the Court could rule now on whether "NYSEG" and "NYG&E" are "similar enough on their face to create confusion, Tr. (Dkt. #36) at 27.

Furthermore, in deciding a motion for a preliminary injunction, the Court need only determine whether the moving party has shown a *likelihood* of success on the merits. In so doing, the Court may determine, based on the record before it, whether the plaintiff is likely to succeed on the issue of likely consumer confusion. *See*, *e.g.*, *Virgin Enterprises, Ltd. v. Nawab*, 335 F.3d 141, 146-52 (2d Cir. 2003). Based on the undisputed facts before me, as set forth above, I conclude that NYSEG has demonstrated a likelihood of success on that issue. *See Charette v. Town of Oyster Bay*, 159 F.3d 749, (2d Cir. 1998) ("An evidentiary hearing is not required [to decide a motion for a preliminary injunction] when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case, or when the disputed facts are amenable to complete resolution on a paper record") (citation omitted); *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) (stating that "there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a

preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it," and that "[g]enerally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when *essential* facts are not in dispute") (internal quotes and citations omitted) (emphasis added); *see, e.g.*, *New York Civil Liberties Union v. New York City Transit Auth.*, ___ F.Supp.2d ___, 2009 WL 4980408, at *1 (S.D.N.Y. 2009) ("The relevant facts ... are largely undisputed, and to the extent factual disputes do exist, their resolution is unnecessary to the disposition of these motions. As such, the Court finds that no evidentiary hearing is necessary to resolve Plaintiff's motion for a preliminary injunction").

At the same time, however, the Court recognizes that it is in the interests of both sides here to resolve the issues in this case and reach a final decision on plaintiff's claims. Accordingly, the parties may commence discovery immediately, and this case is referred to Magistrate Judge Jonathan W. Feldman for the purposes of setting up and overseeing an expedited discovery schedule.

There remains the matter of the posting of a bond. Rule 65(c) of the Federal Rules of Civil Procedure provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

Although "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm ...," *Corning Inc. v. PicVue Electronics, Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (quoting

*Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997)), in general the posting of a

bond is a requirement for a preliminary injunction to issue, unless the court is able to articulate a

sound basis for dispensing with that requirement. *Corning, Inc.*, 365 F.3d at 158.

In the case at bar, plaintiff's counsel stated at oral argument that NYSEG was "prepared

to post a bond" if the Court were to grant an injunction. Tr. (Dkt. #36) at 48. I believe that a

bond should issue, but at this point there is nothing in the record before me concerning the

appropriate amount of such a bond. Accordingly, the Court will give both sides an opportunity to

file additional submissions concerning that issue, as set forth in the Conclusion below.


## CONCLUSION


Defendant's motions to dismiss the complaint (Dkt. #3, #11), and its motion to strike

plaintiff's motion for a preliminary injunction (Dkt. #26), are denied.

Plaintiff's motion for a preliminary injunction (Dkt. #7) is granted. Defendant is hereby

enjoined, pending further order of this Court, from using the marks "New York Gas & Electric"

and "NYG&E" in connection with the sale or offering for sale of natural gas and electricity.

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, plaintiff shall be required

to post a bond, in an amount to be determined by the Court. Unless the parties are able to agree

on the amount of the bond, defendant is hereby directed to file, within seven (7) days of the date

of this Decision and Order, a written submission setting forth its request (and the basis for that

request) as to the bond amount.  Plaintiff shall file its response to that request within seven (7) days after the date of filing of the defendant's submission.

The Clerk of the Court is hereby directed to assign this case to United States Magistrate Judge Jonathan W. Feldman for the supervision of discovery, which shall commence immediately.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       March 19, 2010.